**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
08/20/2013

| | | |
|---|---|---|
| **IN RE:** | § | |
| **R&K FABRICATING, INC.** | § | **CASE NO: 10-33878** |
| **and** | § | |
| **RICARDO GONZALEZ** | § | |
| Debtor(s) | § | |
| | § | **CHAPTER  11** |
| | § | |
| **MICHAEL J. DURRSCHMIDT** | § | |
| Plaintiff(s) | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 12-03177** |
| | § | |
| **FROST NATIONAL BANK,** *et al* | § | |
| Defendant(s) | § | |

## MEMORANDUM OPINION

This Memorandum Opinion addresses:

1. Trustee's Motion for Leave to Amend Complaint (ECF No. 204);

2. Defendant Tokio Marine & Nichido Fire Insurance's Motion for Leave to File Third Amended Cross-Claim in Compliance with Court's Order (ECF No. 209); and

3. Defendant Wyendell S. Evans' Motion for Leave to File Cross Counter-Claim Against Tokio Marine & Nichido Fire Insurance Company, Ltd. and Cross Complaint Against Crawford & Company (ECF No. 224).

The Trustee's Motion for Leave to Amend is granted, in part, and denied, in part.

Tokio's Motion for Leave to Amend is granted, in part, and denied, in part.  Evans' Motion for

Leave to File Cross Counter-Claim and Cross Complaint is denied.

### General Background

R&K Fabricating, Inc. ("R&K") is the Debtor in Case No. 10-33878.  Plaintiff, Michael

Durrschmidt was the Chapter 11 Trustee, and is now the Disbursing Agent.  The Court issued a

Report and Recommendation on November 29, 2012.  ECF No. 128.  The facts set forth in the November 29, 2012 Report and Recommendation are incorporated herein by reference.

R&K leased six forklifts (the "Forklifts") from Universal Forklift Supply ("UFS").  ECF No. 128 at 2.  When Hurricane Ike hit Houston on September 13, 2008, four of the Forklifts were in R&K's possession, and two were being repaired at Mr. James Perkin's shop.  ECF No. 128 at 2.  One of the two forklifts at Mr. Perkins' shop was returned to R&K after Hurricane Ike.  ECF No. 128 at 3.  On November 11, 2008, UFS repossessed five of the Forklifts from R&K's facilities.  ECF No. 128 at 3.  The sixth Forklift was being held by Mr. Perkins under possessory lien rights, and was repossessed by UFS on December 1, 2008.  ECF No. 128 at 3.

UFS was insured by Tokio Marine & Nichido Fire Insurance Company, Ltd. ("Tokio").  ECF No. 128 at 3.  On November 25, 2008, Wyendell Evans, then president of UFS, contacted Tokio to initiate an insurance claim for flood damage to the Forklifts allegedly sustained during Hurricane Ike.[1]  ECF 128 at 3.  Crawford & Company ("Crawford") was the adjuster engaged by Tokio to investigate the insurance claim filed by UFS.  On February 25, 2009, Evans executed two sworn proofs of loss claiming that the Forklifts were a total loss.  ECF No. 128 at 3.  In late February, 2009, UFS received payments from Tokio of $226,645.00 and $22,582.62 for the Forklifts.  ECF 128 at 4.

## I.     Trustee's Motion for Leave to Amend Complaint

Durrschmidt filed his Motion for Leave to Amend Complaint on April 9, 2013.  ECF No. 204.  The Proposed Fourth Amended Complaint is attached to the Motion as Exhibit 1.  ECF No. 204-1.  Durrschmidt seeks leave to assert claims against Louis F. "Bud" Goza, and to

---

[1] The dispute over whether the Forklifts were actually damaged is the crux of this litigation. Durrschmidt, R&K and Tokio allege that the Forklifts were not damaged during Hurricane Ike, and were operable when repossessed. Evans alleges that R&K indicated to UFS that the Forklifts were damaged by the storm, and needed to be picked up by UFS.  ECF No. 224-1 at 3-4.

consolidate claims asserted against Crawford with the other causes of action in one pleading. ECF No. 204 at 3. Goza filed his Response to Durrschmidt's Motion on April 30, 2013. ECF No. 211. Durrschmidt filed his Reply on May 14, 2013. ECF No. 223. Goza filed his Sur-Reply on June 5, 2013. ECF No. 229. Both parties filed Supplemental Briefs on June 28, 2013. ECF Nos. 234 & 235.

Durrschmidt's Proposed Fourth Amended Complaint asserts claims against Goza for (1) fraud, (2) fraud by nondisclosure, and (2) conspiracy to defraud. ECF 204-1 at 60-61. He asserts both direct and veil piercing liability. Durrschmidt's Motion is granted to allow Durrschmidt to consolidate claims asserted against Crawford with the other causes of action, and to assert claims against Goza for fraud and conspiracy to defraud. Durrschmidt is not granted leave to amend to assert claims for veil piercing or for fraud by nondisclosure.

### A.    Background

Durrschmidt alleges that Goza is liable for fraud on three separate bases. First, Durrschmidt alleges that Goza directly participated in fraud perpetrated against R&K and the Estate. Second, Durrschmidt alleges that Goza is liable for fraud under the theory of piercing the corporate veil. Last, Durrschmidt alleges fraud by non-disclosure. Durrschmidt will be given leave to amend to plead a claim of fraud based on Goza's direct participation in the fraud. He will not be given leave to amend to plead fraud based on a veil piercing theory or nondisclosure.

Durrschmidt alleges the following facts. In 2005, Goza invested $100,000.00 in UFS, acquiring a 51% ownership interest. ECF No. 204-1 at 42. During 2008, Goza was a 51% owner of UFS. ECF No. 204-1 at 42. On January 31, 2009, Goza became an 85% owner in UFS. ECF No. 204-1 at 42. This was more than three weeks prior to the date Tokio issued its check for UFS' insurance claim. ECF No. 204-1 at 42. Joe Robinson, UFS' Service Manager

and salesman of service during 2008 through September 2011, testified that Goza closely participated in the day-to-day management of UFS.  ECF No. 204-1 at 42.  He testified that Goza was at the UFS premises almost every day.  ECF No. 204-1 at 42-43.  Robinson described heated conversations between Goza and Evans over management.  ECF No. 204-1 at 46.  He also described loud arguments overheard between Goza and UFS' bookkeeper related to the manner of UFS' bookkeeping.  ECF No. 204-1 at 46.  Robinson also described his personal confrontations with Goza relating to the service department, and Robinson's ability to timely service forklifts.  James P. Knight, a former UFS salesman, testified that Goza required the financial business of UFS to be documented down to the penny, and wanted to know where every penny was going.  ECF No. 204-1 at 47.  Knight also testified that Goza would nag him about sales deals, as Goza desired to put incomplete deals on the UFS books for bank and line of credit purposes.  ECF No. 204-1 at 47.

Evans testified that Goza was deeply involved in the business of UFS.  ECF No. 204-1 at 43.  He testified regarding disagreements with Goza over the operation of UFS and said that Goza felt more like an operator than an owner.  ECF No. 204-1 at 43.  Evans testified that he and Goza had meetings weekly, sometimes several times a week and sometimes every day.  ECF No. 204-1 at 43.  Evans testified that he told Goza about the damaged Forklifts in November or December of 2008, and would be surprised to hear that Goza alleged to know nothing about the insurance claim.  ECF No. 204-1 at 49.  On October 12, 2008, Evans gave Goza a written performance report through September 30, 2008.  ECF No. 204-1 at 43.  The report provided that UFS had insurance coverage with Tokio, and that UFS was pursuing a business interruption claim due to Hurricane Ike.  ECF No. 204-1 at 43.

Goza testified that he was the person most familiar with UFS' accounting for 2008 and 2009. ECF No. 204-1 at 46. He admitted that he visited the UFS premises frequently enough to know the employees. ECF No. 204-1 at 46.

On January 19, 2009, Evans wrote a letter to Goza summarizing UFS' 2008 annual performance. ECF No. 204-1 at 44. By the end of 2008, UFS had only $176,410.00 available on its $1,000,000.00 line of credit with First Community Bank,[2] only $142,166.00 available on its $400,000.00 line of credit with Amegy Bank, and only $149,065.00 available on its $1,000,000.00 line of credit with Hitachi Capital America. It had fully drawn on its $750,000.00 line of credit with Zion Credit Corp. ECF No. 204-1 at 44. Goza personally guaranteed all four loans and additionally lent UFS $1,025,000.00. ECF No. 204-1 at 44. During the spring and summer of 2009, Goza had to make or assist UFS in making its payments to First Community Bank. ECF No. 204-1 at 44. UFS had six loans with First Community Bank, all of which were guaranteed by Goza. ECF No. 204-1 at 45. Additionally, by November 2009, Goza had pledged over $233,000.00 in certificates of deposit to secure UFS' loans with First Community. ECF No. 204-1 at 45. Goza personally loaned UFS $3,900,000.00 on top of his initial $100,000.00 investment, none of which has been repaid. ECF No. 204-1 at 45. Evans testified that Goza guaranteed all of UFS' obligations to its lenders, pledging his personal assets as additional collateral. ECF No. 204-1 at 45.

By August 2011, Goza became the sole managing member of UFS, and admitted that he learned about the three to four insurance claims that UFS filed related to Hurricane Ike. ECF No. 204-1 at 56. By the time Durrschmidt began his investigation of the Tokio proof of claim in May 2011, Goza was extremely active in the management of UFS. ECF No. 204-1 at 56. Goza

---

[2] During the time Goza was an investor in UFS, he was on the board of directors of First Community Bank, and had been on the board since its inception. ECF No. 204-1 at 45-46. During his tenure on the board, Goza served on the loan committee and various other committees at First Community Bank. ECF No. 204-1 at 46.

personally oversaw the 2011 and 2012 operations and filing of the 2011 tax return.  ECF No. 204-1 at 54.  UFS placed the four remaining Forklifts (which had not yet been sold) on the 2011 tax return and took $45,722.00 in depreciation on these Forklifts in 2011.  ECF 204-1 at 54. Durrschmidt alleges that by 2011, Goza knew that the insurance claim was fraudulent because he knew that two of the Forklifts had been sold, that the other four were being leased, and that UFS received a tax write off of the depreciation based on the original purchase price of the Forklifts. ECF 204-1 at 57.

### B.     Analysis

Federal Rule of Civil Procedure 15(a) provides that courts should freely grant leave to amend pleadings when justice so requires.  Leave to amend should be granted liberally unless the movant acted in bad faith, granting leave to amend would result in prejudice or amendment is futile.  *Garcia v. Unit Drilling Co.*, 396 F. App'x. 133, 136 (5th Cir. 2010).

### a.     *Goza's Direct Participation in Fraud*

Under Texas law, the elements of fraud are:

> "(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury."

*In re Readyone Industries, Inc.*, 400 S.W.3d 164, 168 (Tex. App.—El Paso 2013).

Durrschmidt has pled sufficient facts to support a fraud claim against Goza.  Durrschmidt alleges that Goza learned of the insurance claim before payment on the claim was made by Tokio.  Additionally, Durrschmidt alleges that Goza actively participated in the day-to-day affairs of UFS, which would tend to show that Goza knew that the Forklifts were not damaged. Despite this knowledge, Goza accepted the insurance proceeds from Tokio and subsequently

booked them as a sale on UFS' financials to prevent UFS from operating at a loss in 2008. These actions suffice to show a material representation was made by Goza.

Durrschmidt has pled sufficient evidence to show that this representation was false. First, as incorporated from the November 29 Report and Recommendation, there is sufficient evidence that the Forklifts were operable when repossessed from R&K's facility and were not, in fact, damaged during Hurricane Ike. The false reporting of the transaction as a sale for 2008 is also sufficiently pled.

Durrschmidt has shown that Goza knew the representation was false. Durrschmidt has pled sufficient facts to show that Goza knew about the insurance claim, and was intimately familiar with the affairs of UFS, meaning he also knew the insurance claim was fraudulent. Knowing that the claim was fraudulent, Goza accepted the insurance proceeds and booked them as a sale although he knew they were actually proceeds from the insurance claim. Moreover, knowledge need not be pled with specificity. Fed. R. Civ. P. 9. For pleading purposes, knowledge can be inferred.

Durrschmidt has pled sufficient facts to show that Goza intended for the Estate to act upon the misrepresentation. Tokio, as subrogee of UFS, obtained a judgment against R&K in state court and subsequently filed a proof of claim in R&K's bankruptcy based on the allegedly fraudulent claim. The purpose of both obtaining a judgment against R&K in state court, and filing a proof of claim, was for R&K to ultimately bear responsibility for the fraudulent insurance claim.

Durrschmidt has shown reliance on the fraud in that R&K filed bankruptcy due, in substantial part, to the state court judgment, and the Trustee relied on the fraud in conducting an investigation into Tokio's proof of claim.

The Estate was harmed by the fraud because it was forced to investigate and defend against Tokio's proof of claim, and has incurred significant fees to that end.

### b.    Heightened Pleading Under Rule 9(b)

Under Fed. R. Civ. P. 9(b), fraud claims must be alleged with particularity concerning the circumstances of the fraud.  *See Oppenheimer v. Prudential Sec. Inc.*, 94 F.3d 189, 195 (5th Cir. 1996).  To satisfy Rule 9(b)'s heightened pleading standard a plaintiff must plead the time, place and substance of the false misrepresentation, as well as who made the misrepresentation and how it benefitted them.  *Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp., et al.*, 499 F. App'x 345, 349 (5th Cir. 2012).  Durrschmidt has met the heightened pleading standard of Fed. R. Civ. P. 9(b).

### i.    Time, Place and Substance

The alleged fraud began in 2008 when the insurance claim was filed.  Durrschmidt alleges that the fraud continues because UFS, Evans and Goza failed to admit to or rectify the fraud.  The Court makes no determination today regarding the duration of the alleged fraud, but finds that "when" the alleged fraud occurred has been pled with particularity.

Durrschmidt alleges that the fraud occurred at the UFS premises.  This is where the Forklifts were stored after repossession, where Evans filed the insurance claim and corresponded with Tokio and Crawford, and where the dishonest bookkeeping occurred.

Durrschmidt has alleged facts (as set forth in the November 29 Report and Recommendation) showing that when repossessed, the Forklifts were not, in fact, damaged during Hurricane Ike, but were operable.  After repossession, an insurance claim was filed with Tokio alleging that the Forklifts were a total loss due to the damage sustained during the Hurricane.  UFS purchased the Forklifts from Tokio at their salvage value ($26,000.00) and

subsequently made minor repairs to the Forklifts and returned them to the rental fleet. UFS accepted the insurance proceeds from Tokio in February 2009 and booked them as a sale for 2008 in order to prevent UFS from operating at a loss for 2008, thereby avoiding default on UFS' loans.

### ii.    Who

Durrschmidt has alleged facts showing that Goza was involved in the day-to-day operations of UFS and was not merely a passive investor. The deposition testimony of Robinson, Knight, Evans, and Goza himself all tend to show that Goza was present at UFS at least weekly, and sometimes every day, and exercised considerable control over the company's affairs. Facts showing Goza's high level of involvement and control are sufficient to show that Goza participated in the fraud. Moreover, Goza's knowledge can be inferred and need not be pled with particularity. Fed. R. Civ. P. 9.

### iii.    Why

Durrschmidt has pled facts showing Goza's significant personal stake in UFS. He was the personal guarantor on many, if not all, of UFS' loans. Goza pledged over $233,000.00 in certificates of deposit to secure UFS' loans with First Community Bank. Additionally, Goza lent UFS $3,900,000.00 on top of his initial $100,000.00 investment, none of which has been repaid. These facts, regarding Goza's significant personal stake in UFS, are sufficient to show why Goza would commit fraud.

### c.    Piercing the Corporate Veil

Durrschmidt alleges that Goza should be liable for fraud under a veil piercing theory. As the Court held in the November 29 Report and Recommendation, courts will not hold individual officers, directors, or stockholders liable on a corporation's obligations unless the individuals are

using the corporation as a sham to perpetrate a fraud, avoid personal liability, avoid the effect of a statute, or in a few other exceptional situations.  ECF No. 128 at 24 *citing Pabich v. Keller*, 71 S.W.3d 500, 507 (Tex. App.—Fort Worth 2002).

In the November 29 Report and Recommendation, the Court found that Durrschmidt had not pled sufficient facts to show that UFS existed in order for Goza and Evans to perpetrate fraud.  ECF No. 128 at 25.  While the Trustee had shown a strong unity of financial interest between UFS, Evans and Goza, this was not enough to show that UFS was the alter ego of Goza and Evans.  ECF No. 128 at 25.  There was no evidence of comingling of funds, using the corporation for personal purposes or other failure to keep personal and corporate assets separate. ECF No. 128 at 25.  Additionally, there was no evidence that the undercapitalization was intentional or known at the time the entity was formed.  ECF No. 128 at 25.  The Court finds that Durrschmidt's Proposed Fourth Amended Complaint does not remedy this deficiency.

### d.    Fraud by Nondisclosure

Fraudulent concealment requires proof of the following elements:

> "(1) a party conceals or fails to disclose a material fact within the knowledge of that party; (2) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; (3) the party intends to induce the other party to take some action by concealing or failing to disclose the fact; and, (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact."

*Cronus Offshore, Inc. v. Kerr McGee Oil & Gas Corp., et al.*, 369 Fed. Supp. 2d 848, 858 (E.D. Tex. 2004).

Generally, failure to disclose information does not constitute fraud unless there is a duty of disclosure.  *Bradford, et al. v. Vento, et al.*, 48 S.W.2d. 749, 755 (Tex. 2001).  Whether a duty to speak exists is a question of law.  *Id.*  This duty generally only exists when parties have a fiduciary or confidential relationship.  *Pellegrini v. Cliffwood-Blue Moon Joint Venture, Inc., et*

*al.*, 115 S.W.3d 577, 580 (Tex. App.—Beaumont 2003).  Several Texas courts of appeal have also found a duty to disclose information in an arms-length business transaction when a party makes a partial disclosure that conveys a false impression.  *Bradford*, 48 S.W.2d at 755.  The court in *Cronus Offshore* found that a duty to disclose may arise in four situations: (1) existence of a fiduciary relationship; (2) the whole truth must be disclosed when a party voluntarily discloses information; (3) new information must be disclosed if it makes an earlier representation misleading or untrue; and (4) when a partial disclosure conveys a false impression.  *Cronus Offshore, Inc.*, 369 F. Supp. 2d at 858.

No such duty exists here.  At the time of Goza's alleged failure to speak, there was no fiduciary relationship between Goza and the Estate.  Additionally, Goza and the Estate were not involved in an arms-length transaction.  Goza, personally, made no representation to the Estate which he subsequently had a duty to supplement.  In the November 29 Report and Recommendation, the Court held that, although UFS never asserted a proof of claim in R&K's bankruptcy, and was not named in Tokio's Proof of Claim, Tokio's proof of claim was asserted by Tokio as subrogee of UFS, and thus Tokio's claim was also UFS' claim.  ECF No. 128 at 9. Therefore UFS may have had a duty to correct the previously erroneous proof of claim filed by Tokio.  However this is a duty by UFS, and not by Goza.  The only support Durrschmidt provides for imposing a duty to disclose on Goza, individually, is the mention of a duty to speak in securities law cases.  ECF No. 235 at 19 *citing Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 262 (5th Cir. 2005).  The duty to speak in the cases cited by Durrschmidt arises from a statutory duty under the Security Exchange Act, and is inapplicable in this instance.

Durrschmidt argues that under a duty of ordinary care, Goza was required to disclose the fraudulent claims to the Estate.  ECF No. 235 at 16.  There is no duty to act reasonably toward

others generally. *Thrash, et al. v. Ocwen Loan Servicing, LLC (In re Thrash)*, 433 B.R. 585, 597 (Bankr. N.D. Tex. 2010). However, it is true that every person has a duty of reasonable care to avoid foreseeable risk of injury to others. *Id*. at 598. The question of whether a duty exists is a question of law. *Id*. When no clear legal duty has been created, the court must decide whether a duty exists based on the facts before it. *Id*. The facts that a court should consider include, "risk, foreseeability, and likelihood of injury—each balanced against social utility of defendant's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Id*. However, like in *Thrash*, the Court need not determine whether Goza breached a duty of ordinary care to the Estate. Durrschmidt seeks to recover for the benefit of the Estate, all of the attorney's fees, trustee's fees and costs of litigation expended in investigating and prosecuting the Tokio claim objection. ECF No. 204-1 at 68. Durrschmidt has not alleged any independent damages, and must plead more than fees and costs to be entitled to damages for negligence. *Thrash*, 433 B.R. at 597.

Even assuming the facts in the proposed complaint are true, Durrschmidt has not stated a claim for fraud by non-disclosure.

### e. *Conspiracy to Defraud*

A conspiracy to defraud involves (1) two or more persons, (2) with a common purpose, (3) undertaking a common action to defraud, (4) where each person possesses intent to defraud, and (5) each person understands that the other conspirators share the common purpose. *Bayou Terrace Investment Corp., et al. v. Lyles*, 881 S.W. 2d 810, 815 (Tex. App.—Houston [1st Dist.] 1994).

Durrschmidt has pled sufficient facts for a conspiracy to defraud claim. According to the facts alleged, after Goza learned that the insurance claim was fraudulent, he acted in concert with

Evans and UFS to defraud R&K, and subsequently the Estate. The common purpose for the fraud was to obtain the insurance proceeds and to show UFS as solvent when it was, in fact, operating at a loss in order to avoid default on bank loans. Durrschmidt has pled sufficient facts to show that UFS, Evans and Goza were all aware that the insurance claim was fraudulent. Intent to defraud can be inferred from the fact that all three parties concealed knowledge of the allegedly fraudulent claim. Durrschmidt has also pled facts to show that each co-conspirator knew that all co-conspirators shared a common purpose. Evans testified that he and Goza met often, sometimes daily, and that he had informed Goza about the insurance claim. The frequent discussion by the parties is sufficient to show that the parties communicated about the purpose of their allegedly fraudulent acts.

## II.     Tokio's Motion for Leave to File Third Amended Cross-Claim

Tokio filed its Motion for Leave to File Third Amended Cross Claim on April 18, 2013. ECF No. 209. Tokio's Proposed Third Amended Cross Complaint is attached as Exhibit 1. ECF No. 209-1. Tokio sought leave to amend in order to bring its claims against Goza into compliance with the Court's March 27, 2013 Order. Tokio also sought leave to assert four counts against Goza for violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), namely 18 U.S.C. §§ 1962(a), (b), (c) & (d). Goza filed his Objection to Tokio's Motion on May 5, 2013. ECF No. 218. The parties filed simultaneous Supplemental Briefs on June 28, 2013. ECF Nos. 233 & 236.

Tokio's Motion is granted to allow it to bring its claims against Goza into compliance with the Court's March 27, 2013 Order. Tokio's Motion is denied with respect to allowing Tokio to amend to assert causes of action under 18 U.S.C. §§ 1962(a), (b), (c) & (d).

### A.    Background

Tokio alleges the following facts related to its RICO claims.  Tokio is a person that has suffered a compensable injury.  ECF No. 209-1 at 48.  Goza is a culpable person, capable of holding a legal or beneficial interest in property as required by RICO.  ECF No. 209-1 at 48. UFS is an enterprise because it is an individual, partnership, corporation, association or other legal business entity or organization.  ECF No. 209-1 at 48.  UFS presently operates as a forklift seller that engages in interstate commerce.  ECF No. 209-1 at 48.

Tokio alleges that the following predicate acts constitute Goza's pattern of racketeering activity:

- Goza's acceptance of insurance proceeds which were fraudulently obtained (ECF No. 209-1 at 49);

- Reporting the insurance proceeds as sales income to prevent UFS from taking a loss for 2009 (ECF No. 209-1 at 49);

- Violating 18 U.S.C. § 1344 by reporting insurance proceeds as a sale in order to prevent default on UFS' loans (ECF No. 209-1 at 49-50);

- Failing upon discovery, to notify Tokio or its lenders of the fraudulent nature of the insurance claim or the improper booking of the insurance proceeds as a sale (ECF No. 209-1 at 50);

- Violating 18 U.S.C. § 1952 by illegally using the mail in interstate commerce to forward the fraudulent financial information to its lenders (ECF No. 209-1 at 50);

- Violating 26 U.S.C. § 7201 or 7206 by retaining fraudulent insurance proceeds and reporting them as sales income (ECF No. 209-1 at 50-51);

- Violating 18 U.S.C. § 1512 by instructing UFS employees not to discuss the insurance claim (ECF No. 209-1 at 51); and

- Violating 18 U.S.C. § 1957 by continuing the business of UFS with property derived from criminal activity (ECF No. 209-1 at 51).

### B.   Analysis

As discussed *supra*, leave to amend should be granted liberally unless the movant acted in bad faith, granting leave to amend would result in prejudice or amendment is futile.  *Garcia v. Unit Drilling Co.*, 396 F. App'x. at 136.  Tokio will not be granted leave to amend its complaint to add RICO causes of action against Goza because doing so would be futile.

The Racketeer Influenced and Corrupt Organizations Act is codified in 18 U.S.C. §§ 1961-1968.  18 U.S.C. § 1961(5) provides that a "pattern of racketeering" requires at least two acts of racketeering activity, one of which occurred after October 15, 1970, and the last of which occurred within ten years after commission of a prior act of racketeering.  While at least two predicate acts are necessary to establish a pattern, they may not be sufficient.  *H.J. Inc., et al. v. Northwestern Bell Tel. Co., et al.*, 492 U.S. 2893, 2900 (1989).

The key to determining whether predicate acts result in a pattern of racketeering requires a finding of continuity and a relationship between the acts.  *Id*.  A relationship between predicate acts can be shown when predicate acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.  *Id*. at 2901.  Continuity refers either to a closed period of repeated conduct, or past conduct, that by its nature projects into the future and poses a threat of repetition.  *Id*. at 2902.  Continuity may be shown by proving a series of related predicate acts extending over a substantial period of time.  *Id*.

18 U.S.C. § 1964(c) provides a private right of action for any person injured in his business or property from a violation of § 1962.  Section 1962, imposes criminal and civil liability on any person who:

1. Uses or invests income derived from a pattern of racketeering activity to either acquire an interest in, or operate, an enterprise engaged in interstate commerce. 18 U.S.C. § 1962(a);

2. Acquires an interest in, or maintains control over an enterprise through a pattern of racketeering activity.  18 U.S.C. § 1962(b);

3. Being employed by or associated with such an enterprise, conducts or participates in the conduct of its affairs through a pattern of racketeering activity.  18 U.S.C. § 1962(c); and

4. Conspires to violate the first three subsections of § 1962.  18 U.S.C. § 1962(d).

Under § 1962(a), injury must flow from the investment of racketeering income into the enterprise.  *Crowe, et al. v. Henry, et al.*, 43 F.3d 198, 205 (5th Cir. 1995).  Under § 1962(b), the plaintiff must show that his injuries were proximately caused by a RICO person gaining an interest in, or control of, the enterprise through a pattern of racketeering.  *Id.*

To show a violation of § 1962(c) a plaintiff must show: (1) the existence of an enterprise that affects interstate or foreign commerce, (2) that the defendant was employed by or associated with the enterprise, (3) that the defendant was involved in conducting the enterprise's affairs, and (4) that defendant's participation in the enterprise was through a pattern of racketeering activity. *U.S. v. Nieto, et al.*, 2013 WL 3238909, at *4 (5th Cir. June 27, 2013).

Tokio will be not be granted leave to amend to assert its RICO causes of action against Goza because it cannot show injury resulting from violations of § 1962.

Tokio was not injured from a violation of § 1962.  Tokio may have been injured by UFS' filing and Tokio's subsequent payment of the allegedly fraudulent insurance claim.  Tokio's injuries all stem from these events.  The investment of the proceeds in UFS, Goza's continued management or control over UFS, and Goza's employment or association with UFS, did not result in any subsequent injury to Tokio.

## III.    Evans' Motion for Leave to File Cross Counter-Claim and Cross Complaint

Evans' Motion for Leave to File Cross Counter-Claim Against Tokio Marine & Nichido Fire Insurance Company, Ltd., and Cross Complaint Against Crawford & Company, is denied.

### A.    Background

Evans filed his Motion on May 20, 2013.  ECF No. 224.  Evans' Proposed Complaint was attached as Exhibit 1.  ECF No. 224-1.  The Proposed Complaint alleges a cause of action under Chapter 541 of the Texas Insurance Code for a violation of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA") § 17.46.

The following are the salient facts alleged in Evan's Proposed Complaint.  Evans was instructed to contact Tokio's adjusting firm, Crawford, regarding the claim investigation.  ECF 224-1 at 4.  Evans invited Crawford's adjuster to accompany Evans to R&K's facility and he declined.  ECF 224-1 at 4.  Evans was instructed by the adjuster to retrieve the forklifts and preserve them at UFS' facility.  ECF 224-1 at 4.  Crawford's adjuster was given unfettered access to the Forklifts.  ECF 224-1 at 4.  Evans was informed by Tokio and Crawford's agents that the Forklifts were a total loss, and that the damage was covered by UFS' policy with Tokio.  ECF 224-1 at 4.  In reliance on Tokio and Crawford's representations, Evans executed a Sworn Statement in Proof of Loss.  ECF 224-1 at 4.  As a result of Evans' reliance on Tokio and Crawford's representations, Durrschmidt is wrongfully suing Evans.  ECF 224-1 at 6.  Evans

alleges that Tokio and Crawford are liable to him for the damage resulting from his reliance on their false, misleading or deceptive acts or practices, as they have caused him to incur attorney fees and suffer mental anguish.  ECF 224-1 at 6.

Tokio filed its Response to Evans' Motion on June 5, 2013.  ECF No. 230.  Crawford filed its Response on June 7, 2013.  Evans filed his Brief in Support of his Motion on June 28, 2013.  ECF No. 232.  Tokio filed its Brief in Opposition to the Motion on July 3, 2013. ECF No. 237.

### B.    Analysis

As a threshold matter, Tokio and Crawford argue that Evans lacks standing under the DTPA and the Texas Insurance Code because he is not a consumer.   ECF No. 231 at 9; ECF No. 237 at 6.  The Court will not reach Tokio and Crawford's additional arguments because Evans cannot show that he has standing.  *See*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Texas Insurance Code § 541.001 provides that:

> "The purpose of this chapter is to regulate trade practices in the business of insurance by: (1) defining or providing for the determination of trade practices in this state that are unfair methods of competition or unfair or deceptive acts or practices; and (2) prohibiting those trade practices."

Texas Insurance Code § 541.151 provides that:

> "A person who sustains actual damages may bring an action against another person for those damages caused by the other person engaging in an act or practice: (1) defined by Subchapter B to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance; or (2) specifically enumerated in Section 17.46(b), Business & Commerce Code, as an unlawful deceptive trade practice if the person bringing the action shows that the person relied on the act or practice to the person's detriment."

Section 17.46 of the DTPA provides in pertinent part that:

> "(a) False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful…(b) Except as provided in Subsection (d) of this section, the term "false, misleading, or deceptive acts or practices" includes, but is not limited to, the following acts."[3]

The DTPA defines a consumer as:

> "An individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services, except that the term does not include a business consumer that has assets of $25 million or more, or that is owned or controlled by a corporation or entity with assets of $25 million or more."

Texas Business and Commerce Code § 17.45(4).

The consumer standing requirement of the DTPA is not incorporated into the Texas Insurance Code, meaning consumer status is not required to bring a DTPA cause of action under the Texas Insurance Code. *Crown Life Ins. Co. v. Casteel*, 22 S.W.2d 378, 386 (Tex. 2000). If, however, the terms of the incorporated subsection of the DTPA that has allegedly been violated require consumer status, then consumer status is required to bring an action under the Texas Insurance Code. *Id.*

### a.   Standing under Texas Insurance Code Chapter 541

Tokio and Crawford rely on *Allstate Ins. Co. v. Watson* to show that Evans lacks standing under Chapter 541. Watson was injured in a car accident by a driver insured by Allstate. *Watson*, 876 S.W.2d at 146. Watson filed suit against Allstate under Texas Insurance Code Article 21.21 § 16[4] alleging unfair claim settlement practices for failing to attempt to effectuate a

---

[3] Section 17.46(b) lists 27 acts considered "false, misleading, or deceptive acts or practices." Section 17.46(b) is not an exhaustive list of unlawful deceptive trade practices for which someone can bring suit under DTPA §17.46. *Allstate Ins. Co. v. Watson*, 876 S.W.2d 149 (Tex. 1993). However, for purposes of asserting a claim under Chapter 541 for a violation of DTPA §17.46(b), the act or practice must be one enumerated in §17.46(b). *Id.*

[4] The Texas Insurance Code was re-codified, and article 21.21 provisions were placed in Chapter 541. *See Texas Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 435 n. 3 (Tex. 2012).

prompt settlement in good faith.  *Id*.  The court held that the obligations in Article 21.21 are engrafted onto the contract between an insurer and insured and are extra-contractual in nature. *Id*. at 149.  Third party claimants have no contractual or special relationship with an insurer, and have no basis to expect or demand the benefit of the extra-contractual obligations of Article 21.21.  *Id*.  The court reasoned that extra-contractual obligations of Article 21.21 should not be extended to third party claimants because otherwise, insurance companies would be faced with owing coextensive, yet conflicting duties to their insureds and third party claimants.  *Id*. at 150.

Evans argues that *Watson* was distinguished by *Crown Life Ins. Co. v. Casteel*, in which the Texas Supreme Court allowed a third party to bring a direct cause of action against an insurance company under Texas Insurance Code Article 21.21.  In *Casteel*, an insurance broker brought suit against an insurance company alleging Article 21.21 violations, which included claims based on incorporated DTPA provisions.  *Casteel*, 22 S.W.2d at 382.  The Court found that unlike in *Watson*, granting Casteel standing to sue the insurance company did not create a conflict between the insured and a third party.  Rather, the duty owed to the insured comported with the duty owed to Casteel.  *Id*. at 384.  Evans argues that like the insurance broker in *Casteel*, his interests are not adverse to  UFS' interests, and therefore he has standing.

Although Evans' interest may not be adverse to UFS, this case is distinguishable from *Casteel*.  In *Casteel*, the court found that if Casteel was not given standing, insurance companies could make direct misrepresentations to their agents, who would pass those misrepresentations on to consumers, and the insurance company would avoid liability.  *Casteel*, 22 S.W.2d at 385. Here there is no such risk.  Denying Evans standing will not incentivize insurance companies to stop conducting thorough investigations into the validity of claims, because those investigations protect the insurance companies themselves and not the insureds.

The Fifth Circuit has also said that standing under the Texas Insurance Code extends to individuals who are not an insured or a third party beneficiary if the individual can show reliance on the words or deeds of the insurer. *In re Burzynski, et al.*, 989 F.2d 733, 741 (5th Cir. 1993). Evans alleges that he relied on Crawford's report in signing the sworn proofs of loss. However, Evans' alleged reliance on Tokio and Crawford's investigation of the claim was not justified. *See, e.g., Ortiz v. Collins, et al.*, 203 S.W.3d 414, 421 (Tex. App.—Houston 2006) (for fraud, negligent misrepresentation and promissory estoppel, reliance must be justified). UFS, through Evans, was the party that initiated the insurance claim for damage sustained during Hurricane Ike. Evans alleges that it was R&K that informed UFS of damage to the Forklifts. Even assuming this fact as true, UFS should not have filed a proof of claim without at least attempting to ascertain the validity of R&Ks representation, and cannot seek relief from Tokio and Crawford for such a business decision. It is difficult to imagine how Tokio or Crawford should be responsible for Evans' knowledge (or lack thereof), of UFS' loss. Evans initiated the insurance claim *before* Crawford conducted its investigation. He has failed to plead justifiable reliance in a plausible manner. *See Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545-546 (2007).

### b.    Consumer Status under the DTPA

Further, even if Evans could show that he has standing under the Texas Insurance Code, he does not have standing under the DTPA. The Texas Supreme Court has held that acquiring goods or services by purchase or lease is not a prerequisite to being considered a consumer under the DTPA. *Arthur Andersen v. Perry Equip. Corp.*, 945 S.W.2d 812, 815 (Tex. 1997). Rather, to determine whether a plaintiff is a consumer, courts should focus on the plaintiff's relationship to the transaction. *Id.* For example, in *Arthur Anderson v. Perry Equip. Corp.*, Perry Equipment

Corp. ("Perry"), which sought to purchase Maloney Pipeline Systems ("Maloney"), required that Maloney provide audited financial statements as a condition of sale. *Id*. Maloney hired Arthur Andersen for the specific purpose of providing the audited financials to Perry. *Id*. Fourteen months after the sale, Maloney filed bankruptcy, and Perry sued Arthur Andersen for a faulty audit. The court held that the DTPA does not require that the consumer be an actual purchaser or lessor of goods or services, as long as the consumer is a beneficiary of the goods or services. *Id*. Because Arthur Andersen knew that the audit was being prepared for Perry's benefit, and knew Perry would rely on the audit, Perry had standing to sue although it was not the purchaser of the audit. *Id*.

Evans makes the argument that he has consumer status because he relied on Tokio and Crawford's investigation in signing the sworn proofs of loss. However Crawford's investigation was not prepared for Evans' benefit. Rather, Crawford's investigation was prepared for Tokio's benefit. Tokio initiated an investigation not to protect UFS or Evans, but to ensure that Tokio only made payment if the claim was valid. Evans cannot establish standing under the DTPA because he was neither a party to the transaction, nor was he an intended beneficiary of the transaction.

Even assuming, *arguendo*, that UFS has a cause of action against Tokio and Crawford, Evans does not. Courts have found that corporate shareholders are not consumers when a DTPA cause of action belongs to the corporation. *See, e.g. Kenneth H. Hughes Interests, Inc., et al. v. Westrup, et al.*, 8799 S.W.2d 229, 234 (Tex. App.—Houston 1994). The *Westrup* court held that even though stockholders may suffer indirect losses in a wrong done solely to the corporation, they have no independent right to bring an action for injuries suffered by the corporation. *Id*. at 235. If UFS was the consumer in this transaction, any injury to Evans is derivative of any injury

to UFS.  Evans, in his personal capacity, was not the beneficiary of the goods or services supplied by Tokio and Crawford.  The goods or services were not provided for Evans' benefit. Evans has not established consumer status for DTPA purposes.

Assuming again that Evans could show that he has standing under the Texas Insurance Code, there is the possibility that Evans could bring a DTPA claim under Chapter 541 that does not require consumer status.  However, Evans does not specify any § 17.46(b) claim held by him that would not require consumer status.

Moreover, even ignoring the consumer requirement, Evans has not identified any plausible violation of § 17.46(b).  Accordingly, Evans cannot claim a cause of action under Chapter 541 for a violation of § 17.46(b) of the DTPA.

### Conclusion

The Court will enter an order consistent with this Memorandum Opinion.

SIGNED **August 20, 2013.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE